## ARTICLE XXX
### No Strike or Lockout

1. No Employee shall engage in any strike, sit-down, sit-in, slow-down, cessation or stoppage or interruption of work, boycott, or other interference with the operations of the Employer.

2. The Union, its officers, agents, representatives and members, shall not in any way, directly or indirectly, authorize, assist, encourage, participate in or sanction any strike, sit-down, sit-in, slow-down, cessation or stoppage or interruption of work, boycott, or other interference with the operations of the Employer, or ratify, condone or lend support to any such conduct or action.

3. In addition to any other liability, remedy or right provided by applicable law or statute, should a strike, sit-down, sit-in, slow-down, cessation or stoppage or interruption of work, boycott, or other interference with the operations of the Employer occur, the Union, within twenty-four (24) hours of a request by the Employer, shall:

(a) Publicly disavow such action by the Employees.

(b) Advise the Employer in writing that such action by Employees has not been called or sanctioned by the Union.

(c) Notify Employees of its disapproval of such action and instruct such Employees to cease such action and return to work immediately.

(d) Post notices at Union Bulletin Boards advising that it disapproves such action, and instructing Employees to return to work immediately.

4. The Employer agrees that it will not lock out Employees during the term of this Agreement.

## ARTICLE XXXI
### Grievance Procedure

1. A grievance shall be defined as a dispute or complaint arising between the parties hereto under or out of this Agreement or the interpretation, application, performance, termination, or any alleged breach thereof, and shall be processed and disposed of in the following manner:

Step 1. Within a reasonable time (except as provided in Article XXIX), an Employee having a grievance and/or his/her Union delegate or other representative shall take it up with his/her immediate supervisor. The Employer shall give its answer to the Employee and/or his/her Union delegate or other representative within five (5) working days after the presentation of the grievance in Step 1.

Step 2. If the grievance is not settled in Step 1, the grievance may, within five (5) working days after the answer in Step 1, be pre-

sented in Step 2. When grievances are presented in Step 2, they shall be reduced to writing, signed by the grievant and his/her Union representative, and presented to the grievant's department head or his/her designee. A grievance so presented in Step 2 shall be answered by the Employer in writing within five (5) working days after its presentation.

Step 3. If the grievance is not settled in Step 2, the grievance may, within five (5) working days after the answer in Step 2, be presented in Step 3. A grievance at this step will be presented in writing to the Personnel Director or Administrator of the Employer, or his/her designee. A grievance meeting will be scheduled for a mutually agreeable date and time during normal business hours promptly following the receipt by either party of a written request by the other for such grievance meeting as follows:

(a) for disciplinary grievances involving discharges or suspensions within fifteen (15) working days; (b) for other grievances twenty-five (25) working days.

If the parties cannot agree on a date and time for a grievance meeting within this period, then each side will offer in writing three (3) dates and times (during normal business hours) from which the other side will pick one. From the two (2) dates so selected one will be chosen by the parties on alternating grievances provided such date is not more than fifteen (15) working days or twenty-five (25) working days from the date of the request for a grievance meeting depending on the type of grievance. Notwithstanding the above, each side will be entitled to one (1) adjournment of this date by written request delivered to the other party before the scheduled date, in which event a new date will be scheduled within fifteen (15) or twenty-five (25) working days of the initial scheduled date depending on the type of grievance. Selection of an adjourned date shall be according to the same procedure used to schedule the original date. The Employer shall use its best efforts to render its written decision within five (5) days after the third step grievance meeting; in no event will its written decision be rendered more than ten (10) days following such meeting.

Failure of either party to appear and fully present its case at the grievance meeting on the scheduled date and time or of the Employer to render its decision within the time limit set forth above shall result in a default by such party and the grievance shall be deemed granted by the Employer, or waived by the Union as the case may be, but solely with respect to the particular grievance (i.e., the deemed grant or waiver will not bind or be a precedent in other cases). In cases involving violence, theft, patient abuse, substance abuse on premises, or serious misconduct of equivalent level, the default may be cured within ten (10) days of default notification (i)

by either party by appearance and full presentation of its case at a third step grievance meeting, or (ii) where the decision was not rendered timely, by the Employer rendering its decision. This paragraph shall not apply to a grievance arising from the issuance of disciplinary warnings where no other disciplinary action (e.g. termination or suspension, etc.) is involved.

In the event that the number of grievance meetings requested is beyond the ability of the Employer to schedule within the pre-scribed time limits, the Union and the Employer shall attempt to resolve the problem by mutual agreement. Should they fail to reach agreement within five (5) working days, George Nicolau shall resolve the issue of determining if there is a bona fide overload and the procedure that should apply in such case.

The above time limits and sanctions shall apply to grievances presented at Step 3 on or after April 16, 1993.

Failure on the part of the Employer to answer a grievance at any step shall not be deemed acquiescence thereto (except as pro-vided above with respect to third step grievances), and the Union may proceed to the next step.

All third step decisions will be mailed to the Organizer and Area Director in care of the Union Headquarters (310 West 43rd Street, New York, NY 10036) and a copy given to the delegate who handled the case.

Anything to the contrary herein notwithstanding, a grievance concerning a discharge or suspension may be presented initially at Step 3 in the first instance, within the time limit specified in this Article XXXI, paragraph 1.

Without waiving its statutory rights, a grievance on behalf of the Employer may be presented initially at Step 3 by notice in writ-ing addressed to the Union at its offices.

2. All time limits herein specified shall be deemed to be exclu-sive of Saturdays, Sundays and holidays.

3. Any disposition of a grievance from which no appeal is taken within the time limits specified herein shall be deemed resolved and shall not thereafter be considered subject to the grievance and arbitration provisions of this Agreement.

4. A grievance which affects a substantial number or class of Employees, and which the Employer representative designated in Steps 1 and 2 lacks authority to settle, may initially be presented at Step 3 by the Union representative.

## ARTICLE XXXIA
### Mediation

1. It is the intention of the parties that the mediation process

provided for below will be available to assist in the disposition of disciplinary disputes and cases of contract application concerning fact oriented issues, but not to disputes involving contract interpretations which have League-wide ramifications. The latter will be presented to the Contract Interpretation and Policy Committee (CIPC) under Article XXXI B.

2. Grievance mediation (effective for grievances presented at Step 3 on or after November 1, 1992)

(a) Upon the request of either party a grievance not resolved at the third step shall be submitted to mediation within ten (10) working days after the completion of Step 3 of the grievance procedure.

(b) The parties shall utilize the Federal Mediation and Conciliation Service ("FMCS") to administer the mediation procedure under this Agreement. If the volume of mediation exceeds the scheduling capability of FMCS or FMCS is otherwise unable to provide the necessary service, the parties shall establish a list of ten (10) mediators who will be assigned on a rotating basis. The parties shall continue to investigate other mediation services. In an effort to create an atmosphere which allows the parties to communicate efficiently with each other, mediation will be held at the Employer's premises provided that there is no disruption of the Employer's normal operations nor threat of disruption of such operations during the mediation process.

(c) The parties may present up to five (5) grievances per mediation session. Wherever possible, each side shall present its case within thirty (30) minutes.

Each party will designate a spokesperson among those present (no outside lawyers or house counsel).

(d) Cost of mediation is to be borne equally by the parties.

(e) The mediators will attempt to assist the parties to resolve each grievance on mutually agreeable terms. Any recommendation by the mediator will be made at the time of the meeting. No recommendation by the mediator shall be in writing (except as the parties may agree) and no positions, testimony or statement by any party, his/her representative, the mediator or witness shall be used in any future arbitration proceeding or for any other purpose.

(f) All currently outstanding arbitrations involving disciplinary disputes and cases of contract application concerning fact oriented issues, in which no hearing has yet been held, at the request of either party, shall be submitted to mediation within one hundred twenty (120) days of the effective date of this provision. The referral to mediation will not delay any scheduled arbitration hearing unless the parties mutually agree to such delay.

## ARTICLE XXXIB
### Contract Interpretation and Policy Committee

1. A Contract Interpretation and Policy Committee ("CIPC") shall be created under this Agreement consisting of the President of 1199 and the President of the League, who shall each appoint one other member. Their appointments for the term of this contract are Basil Paterson, Esq. and Robert Linn, Esq.

The function of CIPC will be to mediate and attempt to resolve disputes that may arise under this Agreement in areas specifically set forth herein which will have major policy implications, and to ensure the successful achievement of the goals of the 1199 Employment, Training and Job Security Program (see paragraph 3 below).

In the absence of a resolution by the Contract Interpretation and Policy Committee, the issue shall be submitted to Basil Paterson, Esq. and Robert Linn, Esq. Upon their failure to agree, the unresolved issue shall be submitted to an arbitrator selected by them.

To expedite its assignments and to deal with routine matters, the Contract Interpretation and Policy Committee may establish procedures to delegate responsibilities as it deems appropriate.

2. A grievance, as defined in Article XXXI (Grievance Procedure), which has not been resolved thereunder and which is subject to the jurisdiction of CIPC may be referred to CIPC for resolution by the Employer, Union or League, provided the Union or Employer as the case may be, either (a) has filed a timely* demand for arbitration under Article XXXII, or (b) refers the grievance to CIPC within thirty (30) working days of completion of Step 3 of the grievance procedure. CIPC shall have authority to resolve:

(a) Disputes involving the following: scope of the recognition clause; subcontracting; compliance with lay-off provisions; Job Security Fund and/or Joint Employment Service issues, notice requirements; and to impose penalties if Employers fail to call in available positions or fail to provide other required information or notices.

(b) Disputes arising from employment security provisions and Articles II (Union Security), VI (Joint Employment Service), VIII (Temporary Employees), VIIIA (Vacancies and Emergency Vacancies), IX (Seniority), IXA (Employment Security and Job

---

*Where a party contests the issue of timeliness of a demand for arbitration under Article XXXII with respect to a matter referred to CIPC and otherwise subject to its jurisdiction, the CIPC arbitrator designated to hear the matter shall have jurisdiction to decide the timeliness issue.

Security Fund), IXB (Consolidation of Departments and Mergers), X(9) (New Job Rates and Titles), (except disputes concerning the content of restructured or newly created jobs) and all disputes involving the interpretation or the application of this Agreement regarding part-timers.

(c) Grievances involving contract interpretation questions with potential League-wide ramifications;

(d) Other disputes as determined by the parties.

3. In addition, but separate from above, the Contract Interpretation and Policy Committee shall:

(a) oversee implementation and coordination of the 1199 Joint Employment Service, Training and Upgrading Fund, and Job Security Fund, and Planning and Placement Fund (collectively the "Employment, Training and Job Security Program" or "ETJSP") (See Article XLII).

(b) Develop ideas to promote quality of work life, including the use of full-time instead of part-time bargaining unit Employees, improve working conditions, workload issues and increasing the skills and value of health care Employees and all related issues.

(c) Review arbitration procedures.

## ARTICLE XXXII
### Arbitration

1. A grievance, as defined in Article XXXI (Grievance Procedure), which has not been resolved thereunder may, within thirty (30) working days after completion of Step 3 of the grievance procedure, be referred for arbitration by the Employer or the Union to an arbitrator selected in accordance with the procedures of the American Arbitration Association. The arbitration shall be conducted under the Voluntary Labor Arbitration Rules then prevailing of the American Arbitration Association.

2. The fees and expenses of the American Arbitration Association and the arbitrator shall be borne equally by the parties.

3. The award of an arbitrator hereunder shall be final, conclusive and binding upon the Employer, the Union and the Employees.

4. The arbitrator shall have jurisdiction only over disputes arising out of grievances, as defined in paragraph 1 of Article XXXI, and he/she shall have no power to add to, subtract from, or modify in any way any of the terms of this Agreement.

5. All grievances contesting a discharge referred to arbitration after the execution of this Agreement shall be conducted in accordance with the procedures of the American Arbitration Association under the Voluntary Labor Arbitration Rules then prevailing; the single panel of arbitrators shall be abolished.

6. The American Arbitration Association will produce one list of eleven (11) names of arbitrators, seven (7) of whom are members of the National Academy of Arbitrators, and all of whom have dates available to hear cases within thirty (30) working days of selection. The parties will alternately strike names until one remains who shall be the arbitrator. The time period for selecting the arbitrator shall be seven (7) business days. The Employer and the Union shall strike the first name on an alternating basis.

7. The arbitration hearing shall be held within thirty (30) working days of appointment of the arbitrator or within thirty (30) working days of completion of the mediation procedure if it has been requested, whichever is later. Neither side shall be entitled to more than one (1) adjournment of that date, unless there is mutual consent. The adjourned date must be within thirty (30) working days of the postponed hearing date.

8. If the parties agree, the arbitrator shall hear more than one case in a day.

9. No briefs shall be submitted in disciplinary cases heard in one day. The parties agree in principle - and the arbitrators will be instructed - that briefing should be avoided or limited in all cases unless complexity of the issues demand briefing. In such situations, the parties must agree on the filing of briefs or obtain approval from the arbitrator to file briefs. Briefs, if permitted, are to be filed within two (2) weeks of hearing.

10. Arbitrators' decisions are to be rendered within two (2) weeks. However, in disciplinary cases, awards shall be issued within forty-eight (48) hours with an opinion to follow.

11. Arbitrators are to be instructed to issue succinct decisions in all cases, attempting, wherever possible, to limit study and writing time to one-half (1/2) day.

12. The parties shall designate a panel of six (6) arbitrators who shall hear cases arising under Article X (Wages and Minimums) paragraph 9 of the Agreement.

13. Exhibit F hereto shall apply with respect to arbitrations of residual classifications.

14. Voluntary Arbitration Project:

In order to reduce the delay and cost of arbitrations, the parties agree to establish a pilot project by May 31, 2005, unless extended by CIPC, which shall apply only to discipline cases. A Committee shall be appointed by the parties, consisting of equal numbers (see c, below), which shall establish appropriate rules and procedures, which shall include the following provisions:

(a) Employers may join the program on a voluntary basis.

(b) An administrator shall be appointed and his or her salary and all administrative expenses will be paid by the P&P Fund.

(c) A group of arbitrators shall be selected by B. McIver, D. Rivera, B. Paterson and R. Linn. Fixed dates each month shall be set aside by said arbitrators to hear such grievances.

(d) It is the intention of the Union and the League and the Employers who participate to have these cases heard and decided on an expedited basis. If possible, hearings shall be concluded in one (1) day, except where the parties or the arbitrator decide an additional day or days is required. In no event shall the Union or an Employer be deprived of the opportunity to present pertinent testimony or other evidence which it deems necessary for the Arbitrator to render an appropriate award. The Arbitrator is empowered to decide any disputes concerning this issue.

(e) Employers who agree to participate in this program shall appoint senior representatives who will join George Gresham, Bruce McIver, Basil Paterson and Robert Linn in administering this program. For each such appointment, the Union shall appoint a counterpart representative from its staff.

(f) Once the rules have been established and arbitrators selected, other (non-League) employers which contribute to the P&P Fund may join the program.

## ARTICLE XXXIII
### Effect of Legislation - Separability

It is understood and agreed that all agreements herein are subject to all applicable laws now or hereafter in effect; and to the lawful regulations, rulings and orders of regulatory commissions or agencies having jurisdiction. If any provision of this Agreement is in contravention of the laws or regulations of the United States or of the State of New York, such provision shall be superseded by the appropriate provision of such law or regulation, so long as same is in force and effect; but all other provisions of this Agreement shall continue in full force and effect.

## ARTICLE XXXIV
### Individual Stipulations

No agreement between the Employer and the Union which provides for an addition to or modification of this Agreement, including the stipulations between each Employer and the Union to be annexed hereto, shall be effective until a copy thereof shall have been countersigned on behalf of the League.

The League will help facilitate the signing of the stipulations.

## ARTICLE XXXV
### Supersedes MOA

This Agreement supersedes the 2001-2005 1199/League Collective Bargaining Agreement ("CBA") and the Memorandum of Agreement dated May 7, 2004 ("MOA"), except for those provisions preserving prior local agreements and stipulations between 1199 and the individual Employers, which remain in full force and effect, unless expressly modified during the course of these negotiations and incorporated in this Agreement.

All terms and conditions in the prior collective bargaining agreements covering the new institutions and/or bargaining units of Employees, including former 144 institutions/units, former AVNH institutions, and others that were not covered by the 1998-2001 or 2001-2005 1199/League collective bargaining agreements, shall remain in full force and effect and shall be deemed local agreements to this Agreement, unless expressly modified during the course of these negotiations and incorporated into this Agreement.

## ARTICLE XXXVI
### Negotiation of Local Issues

In those instances where either the Employer or the Union has raised issues for local negotiation during the course of these negotiations ("local issues"), the Employer and the Union shall continue to bargain over local issues. The execution of this Agreement shall be without prejudice to the rights or remedies of either party with respect to such local negotiations; the grievance and arbitration provisions and the no-strike clause shall not apply to disputes over local issues.

## ARTICLE XXXVII
### Child Care

The Employer shall continue to contribute to the 1199SEIU/ Employer Child Care Fund ("CCF") at a rate of one-half percent (.5%). All Child Care funds shall be commingled under terms approved by the Trustees.

## ARTICLE XXXVIII
### Housing

The League agrees to support efforts to assist 1199 members in obtaining quality, affordable rental and ownership of housing. As such, the League and the Union will establish a joint committee to study members' housing needs and work to develop programs and projects which meet these needs.

### ARTICLE XXXIX
### Health and Safety
### Create a Safe and Healthy Workplace

1. The Employer, the Union, and the individual Employee shall cooperate in encouraging the maintenance of a safe and healthy work place. The Employer shall comply with all Federal, State and local laws, including recently adopted OSHA pathogen standards. The Union shall agree to cooperate in encouraging such rules as are necessary to comply with such laws.

2. The Employer shall provide safety and health training for all Employees on work time. Employees shall receive annually an updated training session. The Union Health and Safety Department will work with the Employer on course content and determining the appropriate number of hours of training.

3. A Safety and Health Committee composed of an equal number of Union and the Employer representatives shall be formed to implement this Article. The Safety and Health Committee shall cooperate to investigate, identify and remove conditions which are hazardous to an Employee's safety and health. Depending on the size of the institution the Union representatives will vary from three (3) to six (6). Said committee may meet monthly. It is agreed that the Union's safety and health committee, and the Union representatives to the joint committee, act hereunder exclusively in an advisory capacity and that the Union, Union safety and health committees, and their officers, Employees and agents shall not be liable for any work-connected injuries, disabilities or disease which may be incurred by Employees.

4. Employee members of the Union-Management Occupational Safety and Health Committee will be paid at their regular rate of pay for conducting inspections, or performing any other function designated by the Safety and Health Committee. Furthermore, an Employee who accompanies a Federal, State or local occupational safety and health inspector on an inspection tour will be paid at his/her regular rate of pay for this time.

5. In the event that any Employee shall be exposed to any communicable disease, the Employer agrees to promptly review proper procedures to be followed by Employees exposed to such communicable diseases.

6. Where an Employee comes in contact with blood and other body fluids as a result of his/her job duties, the Employer will provide Hepatitis B vaccine to the Employee at no cost to the Employee.

## ARTICLE XL
### Local/Institution Labor Management Committees

The parties support the establishment of Local/Institution Labor/Management Committees to explore the issues surrounding the employment of 1199 Employees in those institutions. Those issues may include:

(a) The creation of new job titles.

(b) The creation of institution-based job groupings, job combinations and part-time/full-time jobs.

The Local Labor/Management Committees may by mutual agreement request funds or support for training and facilitation from the P&P Fund (Article XLII).

We support the establishment of such committees.

## ARTICLE XL(A)
### Professional/Technical Practice Committees

1. There shall be a Professional/Technical Practice Committee ("PTPC") consisting of eight (8) members, including: four (4) Employees from professional and technical classifications chosen by the Union and four (4) management representatives, including a department director for the Employer or his or her designated representative.

2. The PTPC shall meet at appropriate intervals as determined by the committee members, but in no event less frequently than four (4) times per year.

3. The purpose of the PTPC will be to improve communications, facilitate discussion and make recommendations concerning professional practice issues that arise from time to time.

4. The recommendations of the PTPC shall be made to the appropriate department director or other Employer representative.

## ARTICLE XLI
### Leon J. Davis/Martin Cherkasky Quality Care Committee

The health care workers of 1199 and the leadership of the League are committed to providing every patient at every institution with the best care we can.

Our health care system is changing. Every day we're faced with new problems that require new treatments, new methods, and new technologies.

While the direction of much of this change is uncharted and unknown, there is certainty that change will come. And with this there will be transformations in the care people receive and the character of the work that we do.

This Contract represents a milestone in our relationship as Union and Management. In the interests of our patients, we have arrived at a mutually acceptable agreement in the spirit of compromise and conciliation.

As people with a common cause, we seek to broaden this relationship. We are looking for new ways to care for our patients, our families, and our community.

In this spirit we are creating the Leon J. Davis/Martin Cherkasky Committee in honor of the distinguished founding presidents of our respective organizations. It will be an open-ended forum for worker/management dialogue and interaction.

The Committee has no fixed agenda. It will deal with both short and long term issues confronting health care workers and the health care system. The issues can be as immediate as how to deal with sub-contracting and as visionary as jointly describing our best ideas for a new health system for the country.

The Committee will be composed of Union and League representatives from rank-and-file Union members to Chief Executive Officers.

Nothing herein is subject to the grievance and arbitration provisions of the contract unless the matter is grievable and arbitrable under another provision of the contract.

### ARTICLE XLII
### P&P FUND

1. The Union and the League have established the 1199SEIU Hospital League Health Care Industry Planning and Placement Fund, Inc. ("P&P Fund"), a Labor-Management Cooperation Act corporation which, consistent with its certificate of incorporation, shall create and operate a Labor Management Planning Program and a Joint Employment Service (See Article VI).

(a) The Labor Management Planning Program ("LMPP") shall:

(i) collect information on job trends and emerging workforce skills, including new job classifications, which affect Union members and the health care industry in general,

(ii) provide training facilitation and funding for training and facilitation to the members on the Local Institution-based Labor/Management Committees and Subcommittees and CIPC,

(iii) provide information and support to CIPC,

(iv) provide administrative support to the CIPC in connection with the fulfillment of the CIPC's goals under this agreement.

(b) The Joint Employment Service shall:

(i) provide job placement and referral services (without a fee) to Employers and to individuals seeking employment in the health care industry.

(ii) assist Employers by recruiting and testing applicants for jobs in the health care industry.

(iii) maintain a computerized bank of prospective employees in the health care industry.

2. For the contract period June 1, 2004 through April 30, 2008, the P&P Fund shall be financed by a diversion of contributions which would otherwise be due and owing to the PF in an amount to be agreed upon by the League and the Union, as provided in a side letter to this Agreement, together with such other amounts as may be required under the terms of any supplemental agreements between 1199 and the League.

## ARTICLE XLIII
### Effective Dates and Durations

1. This Agreement shall be in full force and effect for the period commencing June 1, 2004 and ending April 30, 2008.

2. For the duration of this Agreement, Employers whose prior contracts contained wage and benefit dates different from the League dates shall have the wage and benefit dates in this Agreement adjusted so as to provide the same time interval as existed under the prior Agreement, unless otherwise specified in this Agreement. The next successor Agreement, as to all covered Employers, shall have common dates for wage and benefit adjustments.

3. The League and the Union agree to jointly enter into discussions relative to a renewal of this Agreement no later than the ninetieth (90th) day immediately preceding the termination date of this Agreement.

IN WITNESS WHEREOF, the Union and the League have executed this Agreement this 7th day of May, 2004.*

NEW YORK'S HEALTH & HUMAN SERVICE
UNION 1199/SEIU now known as
1199SEIU UNITED HEALTHCARE WORKERS
EAST

By:_____

Dennis Rivera, President

LEAGUE OF VOLUNTARY HOSPITALS AND
HOMES OF NEW YORK

By:_____

Bruce McIver, President

---

*This Agreement incorporates the provisions of the Memorandum of Agreement dated May 7, 2004.

## EXHIBIT A

## CHECK-OFF AUTHORIZATION

### DUES CHECK-OFF AUTHORIZATION

**TO**

You are hereby authorized and directed to deduct an initiation fee from my wages or salary as required by New York's Health & Human Service Union 1199/SEIU (now known as 1199SEIU United Healthcare Workers East) as a condition of my membership; and in addition thereto, to deduct my membership dues from my wages or salary; and in addition thereto, to deduct each month an amount equal to monthly membership dues to be applied to past unpaid dues until the entire amount of unpaid past dues has been deducted and paid; and to remit all such deductions to New York's Health & Human Service Union 1199/SEIU (now known as 1199SEIU United Healthcare Workers East), 310 West 43rd Street, New York, NY 10036, no later than the tenth of each month immediately following the date of deduction or pursuant to the date provided in the Collective Bargaining Agreement.

This deduction is a voluntary act on my part and shall be irrevocable for a period of one (1) year or until the termination date of the Collective Bargaining Agreement, whichever is sooner, and shall, however, renew itself from year to year unless I give written notice of the revocation of this authorization addressed to the 1199/SEIU Dues and Membership Department at 310 West 43rd Street, New York, NY 10036.

Signature: _____ Date:_____

Print Name:_____

Social Security No:_____ / _____ / _____

Address: _____

City/State/Zip Code:_____

Date given to employer: _____

# EXHIBIT B

## LOCAL 1199 CREDIT UNION
## CHECK-OFF AUTHORIZATION

---

**1199 SEIU FEDERAL CREDIT UNION PAYROLL DEDUCTION AUTHORIZATION**

| | | |
|---|---|---|
| Last Name | First Name | Initial |

Check appropriate transaction: ☐ New ☐ Change ☐ Cancel

Effective with the pay period beginning on

| MO | DAY | YEAR |

I authorize this amount to be withheld from my pay:

by my employer each pay period until further notice and applied to my account at the 1199 SEIU Federal Credit Union. If I leave my employer while there is a balance due the Credit Union, I authorize my employer to deduct any final amount of my pay, commissions and other compensation and/or separation allowance or benefits as may be required by the Credit Union. I receive my pay ☐ monthly ☐ biweekly ☐ weekly

**X** Signature_____ Date:_____

Employer Name: _____ Dept:_____

Employer Address:_____
                              Street Address

_____
      City/Town              State              Zip

**EMPLOYERS COPY**

---

## EXHIBIT C

## POLITICAL ACTION FUND
## CHECK-OFF AUTHORIZATION

### POLITICAL ACTION FUND CHECK-OFF AUTHORIZATION

I hereby authorize NY's Health and Human Service Union 1199/SEIU (now known as 1199SEIU United Healthcare Workers East) to file this payroll deduction card on my behalf with my employer to withhold ❑  $5.00 per month or
❑  $ _____ per month and to forward that amount to the 1199/SEIU Political Action Fund, 310 West 43rd Street, New York, NY 10036.  This authorization is made voluntarily based on my specific understanding that:

(1) The signing of this authorization form and the making of these voluntary contributions are not conditions of my employment by my Employer or membership in any union;

(2) That I may refuse to contribute without any reprisal;

(3) The $5.00 monthly contribution is only a suggestion, and I may contribute more or less without fear of favor or disadvantage from 1199/SEIU or my Employer; and

(4) That 1199/SEIU Political Action Fund uses the money it receives for political purposes, including but not limited to, making contributions to and expenditures on behalf of candidates for federal, state, and local offices and addressing the political issues of public importance.

This authorization shall remain in full force and effect until revoked by me in writing.

Signature: _____ Date: _____

Print Name: _____

Social Security No: _____ / _____ / _____

Address: _____

City/State/Zip Code: _____

Date given to employer: _____

# EXHIBIT D

## Municipal Affiliates

CITY HOSPITAL CENTER AT ELMHURST

BELLEVUE HOSPITAL

GOUVERNEUR HEALTH SERVICES

METROPOLITAN HOSPITAL CENTER

QUEENS HOSPITAL CENTER

**EXHIBIT E**
**Fund Issues**

May 7, 2004

Mr. Dennis Rivera, President
1199SEIU
New York's Health & Human Service Union
310 West 43rd Street
New York, NY 10036

Dear Mr. Rivera:

This letter is delivered simultaneously with the execution of the MOA between the League and the Union covering the period June 1, 2004-April 30, 2008, and has the same force and effect as if set forth therein.

<u>1199 Pension Fund (PF) Issues</u>

As has been recommended by the PF actuary:

(a) Effective October 15, 2004 and retroactive to January 1, 2003, the Projected Unit Credit ("PUC") actuarial method shall be implemented.

(b) By October 15, 2007, an actuarial asset value market restart and new smoothing method shall be implemented.

<u>NBF Cost Savings Initiatives</u>

This sets forth a list of cost savings initiatives identified during the course of negotiations that, if aggressively and effectively implemented should achieve the cost savings commitments in the MOA of $120 million over the life of the MOA and an annual and recurring savings rate of at least $40 million by the end of the MOA. Moreover, the Union and the League have agreed that the Trustees and the Executive Director shall aggressively seek additional ways to reduce the cost of providing benefits while maintaining the integrity of the benefits received by the Union members.

As it is the intention of the parties to maintain and improve the NBF's programs, these and other adjustments are needed to preserve the resources of the NBF to provide its comprehensive health coverage in the face of rising health care costs. Thus, without limiting the potential cost savings approaches the Trustees and Executive Director should pursue, they are directed to implement the following programs, policies and plan changes.

### 1. Mandatory Mail Order for Maintenance Prescription Drugs

This program requires active and retired members who use certain prescription drugs on a regular and long term basis to have those prescriptions filled, by mail, through the NBF pharmacy benefit manager. This program will relieve some members of the need to constantly reorder the drug and to travel unnecessarily. It will help the NBF save resources by purchasing in bulk.

### 2. Mandatory Medicare Risk HMO

A mandatory Medicare risk HMO for those in the greater New York coverage area. The program will provide full hospital, medical, drug, eyeglasses and a limited dental benefit. The NBF shall implement the program as soon as practicable and shall enroll members as soon as the new HMO benefit provider is available. All eligible retirees shall enroll no later than January 1, 2005, except for hardship exemptions.

The Fund shall immediately investigate the availability of a similar program for retirees living in Florida.

The League and the Union shall use their best efforts to add additional networks.

It is the intention of 1199 and the LVHH to maintain and improve the NBF's programs. These and other adjustments are needed to preserve the resources of the NBF to provide its comprehensive health coverage in the face of rising health care costs.

### 3. Medical Management of Patient Care Services

As recommended by the actuarial consultants to the NBF, in order to improve the quality and efficiency of the radiology, laboratory, and medical management of patient care services, the NBF Trustees shall (a) promptly contract with a vendor network as the sole provider to NBF participants and beneficiaries of radiology services and a similar provider for laboratory services and (b) implement a program of improved medical management of patient care services. The radiology and laboratory vendor network provider agreements shall be effective no later than October 1, 2004 and the improved medical management program shall be implemented as soon as practicable.

### 4. Pharmacy Benefits Manager

The NBF shall rebid the contract for a pharmacy benefits manager in order to achieve the most favorable terms available in the marketplace.

### 5. Coordination of Benefits

The NBF shall redouble its efforts to strongly and vigorously enforce its coordination of benefits policy to ensure that all alternative sources of coverage are applied to offset and reduce the cost of providing benefits.

### 6. Full Formulary Program

The mandatory full formulary program, which is administered through the NBF, by its pharmacy benefit manager, effective January 1, 2005, will not cover proton pump inhibitors (e.g., Nexium), except where there is a diagnosis of disease that requires such prescription drugs for effective treatment. For other conditions, members have available effective over-the-counter medications (e.g., Prilosec OTC). Among the programs are the following:

    (i)   Preferred Class. This program works like the NBF's mandatory generic program. If a member chooses a preferred drug, they will have no out-of-pocket expense. If they choose a non-preferred drug, they must pay the difference in cost.

   (ii)   Class Elimination. The NBF is no longer providing drug benefits in the non-sedating anti-histamine class. This includes Claritin, Allegra, and Zyrtec. Members have available effective over-the-counter drugs, e.g. chlortrimetron.

  (iii)   Drug Elimination. Migraine medications which are in excess of FDA guidelines for strength, quantity and duration are eliminated.

In the above programs, the first concern of the NBF is the members' health and welfare. The three programs have been carefully designed to maximize this result. The intervention of a doctor may allow very limited exceptions.

### 7. Annual Dental Allowance

For each member in the Members Choice the Fund will pay up to three thousand dollars ($3,000) per year for the participants and three thousand dollars ($3,000) per year for each covered family member.

For participants in non-Members Choice, the comparable annual limit continues to be one thousand two hundred dollars ($1,200) per year.

The Fund will continue to expand its case management program.

Fund Diversions

The particulars of our agreement outlined in paragraph 6 (B) and paragraph 7 of the MOA are as follows:

1. PF diversions to the P&P Fund now scheduled for August 2004 will be made during August 2005 except for the amounts for the Contract Administrators (approximately $8 million) and RN bridge (approximately $0.32 million) which shall be deducted from the August 2004 Pension Fund contribution. The balance of the PF diversions under the CBA to the P & P Fund are estimated to be $12 million.

2. The periods during which all Fund diversions provided for in this MOA shall take place are set forth in Attachment l to this letter, provided, however, that CIPC shall have authority to change the dates of all Fund diversions based upon the cash flow needs of the Funds receiving such diversions.

3. P & P Fund - For the period May 1, 2005 - April 30, 2008, additional funding of a maximum of $70.1 million shall be provided as follows:

   a. A maximum diversion of $67.1 million from the PF.

   b. A $3 million diversion from CCF during the period May 1, 2004 and April 30, 2005.

4. TUF-For the period May 1, 2005 - April 30, 2008, additional funding of a maximum of $15 million will be provided as follows:

   a. A diversion from the JSF commencing as soon as possible. (Diversion shall be discontinued on earlier of achieving a $15 million diversion or if JSF cash balance goes to $2 million.)

   b. if needed due to discontinuation of the JSF diversion, a PF diversion to make up the balance needed to reach $15 million.

   c. $50,000 study (funded by TUF) to analyze budget procedure and identify potential savings and efficiencies.

Medical Reimbursement Schedule

At the request of the Executive Director of the NBF, the President of the Union and the President of the League shall meet to consider the necessity and viability of improving the medical reimbursement schedule. The factors that they shall consider may include, but are not limited to, the need for such increases, the excess of projected savings over the target set forth at paragraph

6(A)(4) of the MOA (if any), and the availability of Pension Fund diversion dollars.  If they do not reach agreement, the matter shall not be arbitrable, however, the medical reimbursement schedule shall be increased by the value of the projected savings in excess of the target set forth at paragraph 6(A)(4) of the MOA, if any.

Very truly yours,

League of Voluntary Hospitals and Homes of New York

Bruce McIver, President

AGREED:

1199/SEIU, New York's Health & Human Service Union (now known as 1199SEIU United Healthcare Workers East)

Dennis Rivera, President

## ATTACHMENT 1
## TO SIDE LETTER

### Fund Diversions

This schedule sets forth the periods that Fund diversions shall take place, unless CIPC determines that the diversion period(s) for specified diversion(s) should be changed based upon the cash needs of the Fund(s) receiving the diversions.

| Diversion Fund | Receiving Fund/Purpose Total Diversion | Diversion Period | Estimated Amount |
|---|---|---|---|
| PF | Contract Administrator Funding | Aug 2004 | $8 million |
|  | RN Bridge Funding | Aug 2004 | $0.32 million |
| PF | P&P - total of $12 million | Aug 2005 | $12 million |
| PF | NBF - total of $109.6 million | Jan 2005 | $6 million |
|  |  | Jan & Feb 2006 | $41.5 million |
|  |  | Sept, Oct, Nov 2007 | $62.1 million |
| PF & CCF | P&P - maximum of $70.1 million; maximum $67.1 million from PF and $3 million from CCF |  |  |
| CCF |  | July 1, 2004 - Sept. 30, 2005 | $3 million |
| PF |  | Sept 2005 | $12.2 million |
| PF |  | Sept 2006 | $23.7 million |
| PF |  | June & July 2007 | $31.2 million |
| PF | RNTJSF - total of $4.8 million | April 2006 | $1 million |
|  |  | April 2007 | $1.6 million |
|  |  | April 2008 | $2.2 million |
| PF | TUF - total of up to $7 million if necessary |  |  |
| PF | Contract Administrator Funding - total of $24 million | December 2006 | $16 million |
|  |  | December 2007 | $8 million |

**112**         COLLECTIVE BARGAINING AGREEMENT

| PF | Contribution rate reduction - total of $30 million | May 1, 2005 - Dec 31, 2005 | Rate reduced from 6.75 % to 5.65% |
|---|---|---|---|
| JSF & PF | TUF - total of $15 million | | |
| JSF | | June 2004 and continuing | up to $15 million |
| PF | | Undetermined (see Side Letter paragraph 4) | Undetermined (see Side Letter paragraph 4) |
| PF | RN P&P Projects - total of $3.25 million | September 2005 September 2006 September 2007 | $0.45 million $1.4 million $1.4 million |

## EXHIBIT F
### Residual Job Classifications

The following shall apply during the term of this agreement:

(a)    Subject to the limitations set forth in subparagraph (f) below, where the Union seeks arbitration of a grievance asserting that a professional, service, maintenance, clerical or technical job classification at an Employer is improperly excluded from its existing represented unit at that Employer, the claim shall be submitted to an Arbitrator as set forth below.

(b)    The Presidents of the League and the Union (the "Presidents") shall jointly select a standing panel of not less than five (5) Arbitrators to hear disputes arising under this Exhibit F. Members of the panel shall serve for terms limited to two (2) years unless their terms are renewed by mutual agreement of the Presidents. Absent such agreement, or if a vacancy arises on the panel, the Presidents shall jointly select replacement and/or successor Arbitrator(s).

(c)    When a grievance described in subparagraph (a) above has not been resolved under the grievance procedure in Article XXXI, the Union and the Employer shall jointly select an Arbitrator from the panel.  If the Employer and the Union cannot agree on the Arbitrator, they shall select the Arbitrator by alternately striking Arbitrators from the panel list.  A coin toss will determine who strikes first from the list of Arbitrators.  The Union and the Employer shall equally share the cost and expenses of the arbitration proceeding.

(d)    The Arbitrator shall determine if the job classification should be included in an existing unit applying NLRA law, including but not limited to a history of exclusion of the job classification at issue at the Employer, as well as relevant principles of contract law.

(e)    The Union and the Employer shall expedite the arbitration process by defining the relevant issues and agreeing to exchange available relevant information prior to the hearing.

(f)    This arbitration procedure shall not apply to:

(i)    guards;

(ii)    any job classification that is excluded from coverage by this Agreement pursuant to Article I, paragraph 1 (b);

(iii) any professional job classification that is not within a profession already represented by the Union at the Employer;

(iv) any job classification that has been excluded from representation by an express written agreement between the Union and the Employer;

(v) any job classification that is unrepresented as a result of a prior election at the Employer, or as a result of an express exclusion in a prior determination of the NLRB, the SLRB, or any other governmental body;

(vi) job classifications at locations or facilities where the Union does not already represent the bargaining unit to which such titles are alleged to belong; or

(vii) any current arbitration proceeding(s) between the Union and an Employer relating to one or more residual job classification(s).

(g)    The Arbitrator shall have no power to add to, subtract from, or modify in any way any of the terms of this Exhibit F. The Arbitrator's decision under this Exhibit F shall be deemed final and binding by the parties to the proceeding, and neither party shall resort to the National Labor Relations Board for review of the issues covered by the award. Neither party to the proceeding shall challenge such award on the ground that the arbitral forum was improper for resolving the Union's grievance, unless the arbitration is precluded by the terms of subparagraph (f) above.

(h)    Nothing in this Exhibit F shall be deemed to modify or supersede any other provision of this Agreement, including, but not limited to, the provisions of paragraph 2 of Article I.

**EXHIBIT G**
**QCC Language Applicable to**
**Nursing Home Employers on Schedule B**

1199SEIU and the League of Independent Nursing Homes agree that the Quality Care Committee be recognized as a permanent committee.

1.    Committee recognizes:

    A.  Person-centered quality care services improves the quality of care and life of residents and staff.

    B.  Quality of care builds on the quality of our workforce who are dedicated and committed to their work.

    C.  Innovative models of care will advance the cause of person-centered quality care.

    D.  Long-term reform at the state and federal levels is integral to the success of a value-driven system of care and the joint work of QCC.

    E.  Nursing homes are subject to a highly regulated government program requiring a commitment to compliance.

2.    Committee Objectives:

    A.  To advance the cause of person-centered quality care and the reform of the nursing home field.

    B.  To support to ongoing work of the QCC. The QCC has started a movement toward culture change that is unprecedented.

    C.  To support and initiate innovative and new models of care in each facility.

    D.  To work constructively to resolve conflict, pursue mutually compatible objectives, and share a commitment to the person-centered quality care and the economic well-being of each facility and employee.

    E.  To enhance changes to the organization of work that enhances the satisfaction of residents and workers.

    F.  To study and review nursing care practices, including job assignments and duties of bargaining unit members, in Nursing Homes leading to recommendations to the League and 1199 Nursing Home Division leadership in

nursing care practices, including staffing, with the goal of providing appropriate care for each resident in accordance with New York State standards. This committee shall also consider professional and technical practice issues.

3.   Project Structure, Roles & Responsibilities

A.   Quality Care Committee ("QCC") consisting of one nursing home department bargaining unit member and one management representative from each League nursing home chosen by each of the respective parties will:

(1)   Prepare a mission, vision and values statement that will guide the work of the QCC over the term of this contract.

(2)   Prepare an agenda and timelines for its activities through 2008.

(3)   Screen and select expert(s) to conduct research.

(4)   Assist in gathering of resident care data, including current staffing patterns and job descriptions at each of the Association homes.

(5)   Review and evaluate data collected.

(6)   Develop recommendations to the League and 1199 leadership.

(7)   Use interest-based problem solving as basis for discussions.

(8)   Provide regular updates to the leadership of League and 1199 of progress.

(9)   Maintain records of their meetings.

(10) Meet one date per month or as determined by the Committee.

(11) In order to expedite the work of the QCC, subcommittees may be established to study different facets of this issue. Three subcommittees are recognized:

(i)   Workforce Issues

(ii)  Regulatory Issues

(iii) Legal and Liability Issues

B. Quality Care Committee Oversight Committee consisting of two (2) union and two (2) management leadership representatives will:

(1) Oversee this effort, including finalizing the process.

(2) Identify and clear up any roadblocks.

(3) Represent committee between meetings as needed.

(4) Advise and direct the consultants (from the Labor Management Project and any additional external experts).

(5) Monitor the budget.

(6) Review the recommendations of the QCC and determine how to proceed to effectuate those recommendations that are agreed upon.

(7) Will meet monthly or as determined by the Committee.

C. Labor Management Project staff will:

(1) Facilitate meetings of the Quality Care Committee, Oversight Committee.

(2) Provide orientation and training, as required, for the commit-tees on the interest based problem solving process.

(3) Report to the Oversight Committee.

D. Research Consultant(s) Expert(s) will [list to be completed by the QCC]:

(1) Identify standards in nursing home nursing care practices.

(2) Assist the committee in analyzing the data gathered.

(3) Assist the Committee in preparing a report on data and analysis to present to League and 1199 leadership.

E. Timeframe: The goal of the QCC will be to deliver recommendations by December 2004.

F. Boundaries: The parties recognize that:

(1) Some of the recommendations may be outside the control of the Nursing Home Administrators and will suggest legislative intervention.

(2) There are a combination of factors that influence nursing practices and staffing such as resident acuity, technology, different types of care, unit size and geography, qualifications of staff, standards of practice, staff mix, productivity, nature of resident care provided and financial resources.

G. Budget: Up to $1 will be allocated from Planning and Placement to fund the following costs: consulting fees and expenses, facility, food, and materials. This budget anticipates $____ for the research consultant(s). If more resources are required, additional money may need to be raised.

4. Nothing contained herein shall be subject to the Grievance and Arbitration provisions of the Contract.

## SCHEDULE A

## MEMBERS OF THE LEAGUE OF VOLUNTARY HOSPITALS AND HOMES OF NEW YORK A MULTI-EMPLOYER BARGAINING UNIT COVERED BY THIS AGREEMENT AND EXPIRATION DATES OF THE CONTRACTS THAT EXPIRED BEFORE THE 2001-2005 CBAs

| | |
|---|---|
| ARAMARK | 10/31/01 |
| BETH ISRAEL MEDICAL CENTER | |
|    Petrie Division | 10/31/01 |
|    Kings Highway Division | 10/31/01 |
|    Herbert and Neil Singer Division | 10/31/01 |
| BRONX LEBANON HOSPITAL CENTER | 10/31/01 |
|    Bronx Lebanon Hosp. Center Concourse | 10/31/01 |
| BRONX LEBANON SPECIAL CARE CENTER | 10/31/01 |
| BROOKLYN HOSPITAL CENTER, THE | 10/31/01 |
| CABRINI MEDICAL CENTER | 10/31/01 |
|    St. Cabrini Nursing Home | 10/31/02 |
| DOJ HEALTH SERVICES | |
|    DOJ Nursing and Rehabilitation Center | 10/31/01 |
|    Findlay House | 10/31/01 |
|    Findlay Plaza | 10/31/01 |
| EPISCOPAL HEALTH SERVICES, INC. | |
|    St. John's Episcopal Hospital South Shore | 10/31/01 |
|    Bishop Henry B. Hucles Episcopal Nursing Home | 10/31/01 |
|    Bishop McClean Nursing Home | 10/31/01 |
|    Episcopal Health Services South Shore Billing | 10/31/01 |
| INTERFAITH MEDICAL CENTER | 10/31/01 |
|    St. John's Episcopal Hospital | 10/31/01 |
|    Jewish Hospital & Medical Center of Brooklyn | 10/31/01 |
| KINGSBROOK JEWISH MEDICAL CENTER | 10/31/01 |
|    David Minkin Rehab. Institute (Rutland Nursing Home) | 10/31/01 |
| LENOX HILL HOSPITAL | 01/31/02 |
| LONG ISLAND COLLEGE HOSPITAL | 10/31/01 |
| LONG ISLAND JEWISH MEDICAL CENTER | 10/31/01 |
| LUTHERAN MEDICAL CENTER | 10/31/01 |
| MAIMONIDES MEDICAL CENTER | 10/31/01 |
| MANHATTAN EYE EAR & THROAT HOSPITAL | 10/31/01 |
| MEDISYS HEALTH NETWORK | |
|    BROOKDALE HOSPITAL MEDICAL CENTER | 01/31/02 |
|    Schulman & Schachne Institute for Nursing & Rehab | 01/31/02 |
|    Arlene and David Schlang Pavilion | 01/31/02 |
|    FLUSHING HOSPITAL | 11/30/01 |
|    JAMAICA HOSPITAL | 10/31/01 |
|    Jamaica Hospital Nursing Home | 10/31/01 |

| | |
|---|---|
| MONTEFIORE MEDICAL CENTER | 10/31/01 |
|    Henry L. & Lucy Moses Division | 10/31/01 |
|    Jack D. Weiler Hosp. of the Albert Einstein College of Med. | 02/28/02 |
| MOUNT SINAI/NYU HEALTH | |
|    HOSPITAL FOR JOINT DISEASES ORTHOPAEDIC | |
|    INSTITUTE | 01/31/02 |
|    MOUNT SINAI HOSPITAL | 10/31/01 |
|    City Hospital Center at Elmhurst | 10/31/01 |
|    Queens Hospital Center | 10/31/01 |
|    Mt. Sinai Hospital of Queens | 10/31/01 |
|    NYU HOSPITALS CENTER | 02/04/02 |
|    Bellevue Hospital Center | 10/31/01 |
|    Gouverneur Diagnostic Treatment Center | 10/31/01 |
|    NYU DOWNTOWN HOSPITAL | 10/31/01 |
| NEW YORK COMMUNITY HOSPITAL OF BROOKLYN, INC. | 10/31/01 |
| NEW YORK MEDICAL COLLEGE/VALHALLA | 12/31/01 |
| NEW YORK MEDICAL COLLEGE/METROPOLITAN | |
|    HOSPITAL | 10/31/01 |
| NEW YORK METHODIST HOSPITAL | 10/31/01 |
| NEW YORK PRESBYTERIAN HOSPITAL | 10/31/01 |
| NORTH GENERAL HOSPITAL | 01/31/02 |
| NORTH SHORE UNIVERSITY HOSPITAL AT FOREST HILLS | 10/31/01 |
| OUR LADY OF MERCY MEDICAL CENTER | 10/31/01 |
| PENINSULA HOSPITAL CENTER | 01/31/02 |
|    Peninsula General Nursing Home | 01/31/02 |
| PRISON HEALTH SERVICES/RIKERS ISLAND | 10/31/01 |
| SOUTHSIDE HOSPITAL | 10/31/01 |
| ST. BARNABAS HOSPITAL | 01/31/02 |
|    St. Barnabas Nursing Home | 01/31/02 |
| ST. CLARE'S HOSPITAL AND HEALTH CENTER | 11/30/01 |
| ST. LUKE'S-ROOSEVELT HOSPITAL CENTER | |
|    St. Luke's Roosevelt Hospital Center - Roosevelt Site | 10/31/01 |
|    St. Luke's Roosevelt Hospital Center - St. Luke's Site | 10/31/01 |
| SAINT VINCENT CATHOLIC MEDICAL CENTERS | |
|    BROOKLYN & QUEENS REGION | |
|    Mary Immaculate | 10/31/01 |
|    Monsignor Fitzpatrick Skilled Nursing Pavilion | 10/31/01 |
|    St. Anthony's | 10/31/01 |
|    St. John's Queens | 10/31/01 |
|    St. Joseph's | 10/31/01 |
|    St. Mary's Brooklyn | 10/31/01 |
|    St. Matthew's | 10/31/01 |
|    MANHATTAN REGION | |
|    St. Vincent's Manhattan | 10/31/01 |
|    STATEN ISLAND REGION | |
|    Bayley Seton | 10/31/01 |
|    St. Vincent's Staten Island | 10/31/01 |

COLLECTIVE BARGAINING AGREEMENT    **121**

STATEN ISLAND UNIVERSITY HOSPITAL
    Staten Island University Hospital - North Site    12/09/01
    Staten Island University Hospital - South Site    10/31 /01
    Staten Island University Hospital - Concord Site    05/18/00
TERENCE CARDINAL COOKE HEALTH CARE CENTER    10/31/01
UNION COMMUNITY HEALTH CENTER    01/31/02

# SCHEDULE B

## NEW LEAGUE MEMBERS
## AND EXPIRATION DATES
## OF THEIR CONTRACTS THAT EXPIRED BEFORE
## THE 2001-2005 CBAs

### NURSING HOMES

| | |
|---|---|
| BETHCO | |
|    Beth Abraham Health Services | 10/31/01 |
|    Center for Nursing and Rehab | 10/31/01 |
|    Schnurmacher Center for Rehab and Nursing | 10/31/01 |
| EGER HEALTH CARE AND REHABILITATION CENTER | 10/31/01 |
| GREATER HARLEM NURSING HOME COMPANY INC. | 11/30/01 |
| ISABELLA GERIATRIC CENTER | 10/31/01 |
| JEWISH HOME & HOSPITAL | |
|    Manhattan Division | 10/31/01 |
|    Bronx Division | 10/31/01 |
|    Sarah Neuman Nursing Home | 6/5/02 |
| MORNING SIDE HOUSE | 10/31/01 |
| PARKER JEWISH INSTITUTE FOR HEALTH CARE | |
|    AND REHABILITATION | 10/31/01 |
| SEPHARDIC HOME | 10/31/01 |
| UNITED ODD FELLOW & REBEKAH | 10/31/01 |
| VILLAGE CARE OF NY | |
|    Rivington House | 10/31/01 |
| WARTBURG LUTHERAN SERVICES | 10/31/01 |
|    Wartburg Lutheran Home for Aging - Brooklyn | 10/31/01 |
|    Wartburg Nursing Home - Brooklyn | 10/31/01 |

### OTHER MEMBERS WHO HAVE JOINED
### SINCE JANUARY 10, 2002

| | |
|---|---|
| NEW YORK WESTCHESTER SQUARE MEDICAL CENTER | 10/31/01 |
| WYCKOFF HEIGHTS MEDICAL CENTER | 10/31/01 |

Dated: May 7, 2004

Attached hereto and made part of the Collective Bargaining Agreement between the parties hereto, effective the 1st day of June, 2004, are four stipulations which are referred to respectively in Articles I, X and XI, XV and XX of the 2004-2008 Collective Bargaining Contract between New York's Health & Human Service Union 1199/SEIU (now known as 1199SEIU United Healthcare Workers East), and the League of Voluntary Hospitals and Homes of New York as agent for and on behalf of each of its member institutions whose names appear on Schedule A & B of the contract, of which latter association the undersigned Employer is a member referred to on Schedule A & B. These stipulations set forth respectively are applicable to the undersigned Employer, the bargaining unit(s) represented by the Union, the Employer Minimum Rates and Hours of Work, Past Practices, and the holidays and free days. The undersigned Employer agrees that these stipulations shall be in full force and effect for the term of the Collective Bargaining Agreement between the Union and the undersigned Employer.

(Employer)

By:_____

NEW YORK'S HEALTH & HUMAN SERVICE
UNION 1199/SEIU (now known as 1199SEIU
UNITED HEALTHCARE WORKERS EAST)

By:_____

LEAGUE OF VOLUNTARY HOSPITALS
AND HOMES OF NEW YORK

## STIPULATION I

The bargaining unit(s) covered by 1199 in_____
_____referred to in Article I
_____of the Collective Bargaining Agreement
between 1199 and the League of Voluntary Hospitals and Homes
of New York are:

## STIPULATION II

### MINIMUM RATES AND HOURS OF WORK

### UNIFORM JOB TITLES & RATES

### NON-UNIFORM JOB TITLES & RATES

## STIPULATION III

HOSPITAL:_____

PAST PRACTICES

The past practices referred to in Article XX are:

## STIPULATION IV

HOSPITAL:_____

### HOLIDAYS

Legal Holidays:

Other Holidays or Free Days:

### Side Letter re: CIPC

May 7, 2004


Mr. Bruce McIver, President
League of Voluntary Hospitals
 and Homes of New York
555 West 57th Street, Room 1530
New York, NY 10019

Dear Mr. McIver:

If the financial assumptions underlying the Agreement prove to
be substantially insufficient and there is a significant adverse
impact on the Employers, then the issue can be submitted to
CIPC without the issue being subject to arbitration.

Very truly yours,

Dennis Rivera, President
1199SEIU, New York's Health &
Human Service Union
(now known as 1199SEIU
United Healthcare Workers East)


AGREED:
League of Voluntary Hospitals
and Homes of New York

Bruce McIver, President

**Side Letter re: 144 Minimums**

May 7, 2004

Bruce McIver, President
League of Voluntary Hospitals and Homes of New York
555 W. 57th Street
New York, NY 10019

Re:    144 Minimums

Dear Bruce:

This will confirm our agreement that the parties shall establish a committee to explore ways of raising 144 minimums and experience steps to the comparable levels of the League uniform classification rates. The parties may seek the assistance of the Labor-Management project in the P & P Fund to assist in its deliberations.

Very Truly Yours,

Dennis Rivera, President
1199SEIU, New York's Health &
Human Service Union
(now known as 1199SEIU
United Healthcare Workers East)

AGREED

Bruce McIver, President

### Side Letter re: OLM

May 7, 2004

Mr. Bruce McIver, President
League of Voluntary Hospitals and Homes of New York
555 West 57th Street, Room 1530
New York, NY 10019

Dear Mr. McIver:

The parties agree that certain Employers may have situations in which some bargaining units are not in the NBF as of 6/1/04. In those situations, the parties agree that the President of the League and the President of the Union may modify the application of the Collective Bargaining Agreement so that such Employers are affected in an equitable manner when compared to the cost and/or benefits applicable to Employers generally under this Agreement. This provision shall not be subject to arbitration.

The parties shall meet expeditiously to review the OLM situation.

Very truly yours,

Dennis Rivera, President
1199SEIU, New York's Health &
Human Service Union
(now known as 1199SEIU
United Healthcare Workers East)

AGREED:

League of Voluntary Hospitals
And Homes of New York

Bruce McIver, President

### Side Letter re: Alternatives to Layoffs

May 7, 2004

Mr. Dennis Rivera
President
New York's Health and Human Service Union
1199/SEIU
310 West 43rd Street
New York, New York 10036

Re:     <u>Alternatives to Layoffs</u>

Dear Dennis:

This is to confirm that you and I will meet at your request to discuss programs that may be developed as "Alternatives to Layoffs".

Sincerely,

Bruce McIver

cc: Basil Paterson, Esq.

## Side Letter re: Non-Discrimination

May 7,. 2004

Mr. Dennis Rivera
President
New York's Health and Human Service Union 1199/SEIU
310 West 43rd Street
New York, New York 10036

Re:   <u>Non-discrimination language</u>

Dear Dennis:

This will confirm our agreement that Article IV(1) of the Collective Bargaining Agreement has been amended by adding the phrase "sexual orientation". This amendment will not be applicable to an institution which has a religious objection.

Sincerely,

Bruce McIver

AGREED

Dennis Rivera, President

## Side Letter re: NBF Contribution Rate

May 7, 2004

Mr. Dennis Rivera
President
New York's Health and Human Service Union 1199/SEIU
310 West 43rd Street
New York, New York 10036

Re:    <u>NBF Contribution Rate</u>

Dear Dennis:

This is to confirm our agreement that if, during the life of this Agreement, the actuary to the National Benefit Fund recommends that the existing rate (20.85%) be increased, you and I will meet to discuss that issue.

Please sign on the line provided below and return a copy to me.

Very truly yours,

_____
Bruce McIver

AGREED

_____
Dennis Rivera, President

### Side Letter Re: Pension Contribution and ETJSP Funding

May 7, 2004

Bruce McIver, President
League of Voluntary Hospitals and Homes of New York
555 West 57th Street
New York, NY 10019

Re:    <u>Pension Contribution and ETJSP Funding</u>

Dear Bruce:

This letter is delivered simultaneously with the execution of the Collective Bargaining Agreement between 1199 and the League, commencing June 1, 2004 and has the same force and effect as if set forth in the Collective Bargaining Agreement.

Full Funding: For the duration of this Agreement, the Employer's contribution obligation to the Pension Fund ("PF") for any Plan Year shall be the lesser of (1) the percentage amount of gross wages set forth in Article XXIV or (2) the contribution amount set by the Pension Fund Trustees based upon the Pension Fund Actuary's determination of each Employer's allocated portion of the Pension Fund's full funding limitation. In the event the Plan Actuary determines that amounts to be contributed to the PF would be in excess of the contribution limitation, the disposition of the Pension contributions that would otherwise be made shall be referred to CIPC for its consideration in accordance with the following understandings. When amounts have been contributed which the Plan Actuary determines to be in excess of the contribution limitation, such excess amounts shall be returned to the Employer consistent with paragraph 403(c)(2) of ERISA. The Trust Agreement will be amended, if needed, to authorize Trustee action in this regard. It is agreed that any amount of money for PF contributions that are returned to the Employer by reason of this paragraph or which are withheld because the contribution limitation would be exceeded (as confirmed by the Plan Actuary) shall be diverted to another of the 1199/League Funds as determined by CIPC.

For each Plan Year the PF Actuary shall evaluate and report to the League and the Union the contribution limitation as follows: (a) in December, the amount for the Plan Year commencing January 1 of the year following shall be estimated, and (b) in June, the

amount for that Plan Year shall be finalized and reported.

Employment Training and Job Security Program ("ETJSP") Funding: The Employers shall not be responsible for any further funding of the P&P Fund, Training and Upgrading Fund or the Job Security Fund (collectively "ETJSP") during the term of this Agreement other than as set forth at Article IXA (B)(4) (JSF), Article XXII (1) (TUF) and Article XXIV (1)(c) (Pension Contribution Diversion) or as determined by CIPC pursuant to Paragraph 1 above.

Notwithstanding any contribution rate adjustment that may occur pursuant to Article XXIV section 1(b), the rate as of the last day of this collective bargaining agreement shall be 6.75% of gross payroll.

If this letter correctly sets forth our agreement, please sign where indicated below and return a signed copy to me.

Very truly yours,

Dennis Rivera, President

AGREED:

League of Voluntary Hospitals
and Homes of New York
Bruce McIver, President

COLLECTIVE BARGAINING AGREEMENT          **133**

### Side Letter re: Maternity Leave

Dated: March 30, 1990

Mr. Dennis Rivera
President
Local 1199, Drug, Hospital and Health Care
  Employees Union, RWDSU
310 West 43rd Street
New York, N.Y. 10036

Dear Mr. Rivera:

This letter is delivered to you simultaneously with the execution
of the master Collective Bargaining Agreement between the
League and Local 1199. Its purpose is to set forth the basis of the
agreement of the parties with respect to the modification of the
maternity leave provision (Article XIX, paragraph 1).

During the negotiations which led to the renewal of the 1982
agreement, the Union sought removal of the maternity leave pro-
visions which require pregnant Employees to notify the Employer
of the expected date of delivery and the date they wish to stop
work by the end of the third month of pregnancy and, by the end
of the sixth month of pregnancy, to provide a physician's state-
ment certifying the expected date of delivery and the Employee's
physical ability to continue working up to the last day of work
requested by the Employee. These proposals were made on the
ground that continuation of such requirements violated the law.

In settling upon the terms of the renewal agreement, the parties
agreed to revise the maternity leave provision to conform with
the law. Subsequently, the parties disagreed as to whether the
foregoing provisions are legally permissible.

In view of the foregoing, and to expedite execution of a renewal
agreement, we have agreed to remove these provisions from the
contract with the express understanding that the Employers
reserve the right to continue such policies except in the event that
such may be finally determined by an arbitrator or court to vio-
late the law.

**134        COLLECTIVE BARGAINING AGREEMENT**

If the foregoing correctly sets forth our agreement, please indicate your agreement thereto by signing the enclosed copies of this letter agreement in the place indicated.

Very truly yours,

AGREED:

| LOCAL 1199, DRUG, HOSPITAL AND HEALTH UNION, RWDSU | LEAGUE OF VOLUNTARY HOSPITALS AND HOMES OF NEW YORK |
|---|---|
| By:_____/s/_____ | By:_____/s/_____ |